Next case on this morning's docket is the case of Hanagan, Michael J. Hanagan v. Stephen F. Hanagan. And we have here today, we have Mr. Hanley. Hanley. Hanley, sorry. From the Sharp firm, and we have Mr. Michael Hanagan representing himself. So you may proceed when you're prepared to do so, Mr. Hanley. You can get organized there and get going when you're ready. Your Honors, may it please the Court. My name is John Hanley. I'm here today representing the defendant and appellant Stephen Hanagan. In my time before you, I want to leave with you three principal points. First, the record below in this case is too vague and insufficient to support the contempt order and penalty issue. Secondly, the Court erred in sanctioning my client for failing to produce privileged material to the plaintiff. And third, the submission by the plaintiff's then-attorney was insufficient for the circuit court to tie any amount of fees to the alleged wrongs, let alone the sum awarded here. Some background is in order. Following the death of the party's father in 2006, Steve and his brother, the plaintiff and appellee Michael Hanagan, practiced law here in Mount Vernon under the name Hanagan and Dousman, a firm that was founded by their father and William L. Dousman back in the 1950s. It was a firm concentrating in plaintiff's personal injury and workers' compensation cases. This case was filed by Michael on January 20, 2009, after Steve gave Michael notice on January 12, 2009, that he, Steve, was dissolving the partnership. And this is in the written notice that appears at page 222 and 223 of the record, effective immediately, practicing under the name Stephen F. Hanagan, attorney at law, in our office building. Now, Steve has been found to be in contempt of court and sanctioned over $11,000 for two omissions. First, he fails to identify to the firm's bookkeeper as Hanagan and Dousman clients, persons who retained him in his individual capacity after Steve had dissolved that firm. Secondly, he failed to turn over to the plaintiff the files of clients who had retained him in his individual capacity, again, after Steve had dissolved the firm. Now, the relevance of those omissions is that they related to the plaintiff's theory, at that time unplanned. The cases received after the dissolution were nonetheless assets of the firm for which Steve owed his brother money. That claim was eventually pleaded in the complaint to impose a constructive trust, which was filed on February 2, 2011. It raised issues that are still before the circuit court, and the correctness of the circuit court's ruling on that complaint is not before you today. Rather, I point out the filing of that pleading because the alleged contempts here were committed in June 2010, seven months before the complaint for a constructive trust was filed. The contempts alleged here are for alleged violations of an order entered June 23, 2010, purportedly pursuant to an agreement of the parties on April 30, 2010. Michael had pled no right to reach the individual cases that Steve had obtained in his individual capacity, despite being expressly told at the time of the dissolution that a separate practice was being established by Steve upon the premises, despite Steve's openly advertising for clients in his individual capacity, despite clients coming to meet with Steve on the premises that he continued to share with his brother. There was no claim post-dissolution cases stated in the original complaint, which governed the issues at the time of the alleged contempt. Rather, that complaint explicitly and properly listed as an asset of partnership, and this is paragraph 7 of count 1 of the complaint, all pending contingent B cases at the time of dissolution. All cases at the time of dissolution. Explicitly limited at the time of dissolution in the complaint. Mr. Hundley, I'm sorry to interrupt you. Did the trial court ever ask for the cases to be submitted in camera? It did not. Was that ever suggested in order to avoid the contempt? The serious problem here is that the reading of the trial court's order on disclosure did not become apparent until the finding of the contempt. In other words, and I'll make this point later in my presentation, when he entered the original order, he admitted that it was vague and points yet to be decided. The serious problem that evolves here is that Steve is charged with committing a contempt of an order, the essential terms of which had not yet been decided at the time it was entered, and that he couldn't know that he was violating. Thank you. Now, without amending the pleadings, the plaintiff, by way of motion for preliminary injunction filed April 15, 2010, sought to expand the assets of the partnership to include, and I'm quoting the motion, all cases in which representation was accepted after dissolution but prior to final termination. Steve Blumenthal striked that motion, and that's the issues that came before the court on April 30, 2010. Now, it defies belief that Steve had agreed to the expansion of the case against him, which Michael was attempting in his motion. Indeed, disclosure duties, which Michael later argued should be included in the order and on the basis of this contempt, were on April 30, 2010, reported merely as part of, and I'm quoting Mr. Harvey here, the bookkeeping for the Hannigan Endowment Department. In that context, Mr. Harvey called for a submission of cases, list of cases, of any case that originated between January 12, 2009 and April 12, 2010. But that list was, by the express terms of the agreement and a fair reading of the transcript, to be a list of cases of the Hannigan Endowment firm. Now, the significance of that period was explained by Steve in the colloquy which we reproduced in our brief. In worker compensation cases, a claim may be treated as closed on one day, i.e., January 12, 2009, but open on a later date because it can be reopened at a later time under Section 8A or Section 19H of the Act. There was no contention by Steve that the reopening of a Hannigan Endowment case that had been previously closed would not be a Hannigan Endowment asset. So the significance of the January 2009 to April 2010 agreement reported in the transcript was with respect to any cases that might be reopened of the Hannigan Endowment firm. The transcript to the contrary reflects that the parties, or the transcript further reflects that the parties agreed that each had the right to, quote, inspect the files of the Hannigan Endowment. But the transcript also reflects a, quote, disagreement between the parties as to what, if any, economic involvement they have after April, after January 12 of 2009. That's the transcript of that date at page 10. In other words, Steve made perfectly clear that the cases taken in his individual capacity after January 12, 2009, were not a part of the agreement. He agreed to report on any previous Hannigan Endowment case that became subsequently open, but he did not agree to make disclosure concerning cases of his new firm. In the days that followed, Michael became dissatisfied with the agreement he had made. And so in June, he's back in court asking the court to enter an order that was supposed to be an agreed order, but as to which there was, in fact, substantial disagreement. There were disputes concerning a number of its provisions, but for current purposes, the relevant provisions are paragraphs 4 and 8 and 9. In paragraph 4, Mr. Harvey attempted to expand the agreed bookkeeping for the Hannigan Endowment firm to include, and I quote, any matter involving any client for whom an attorney-client relationship existed with either of the parties hereto prior to April 12, 2010. Significant to change. After hearing argument, the court ruled against Michael and changed that language to read clients for whom an attorney-client relationship existed with Hannigan Endowment prior to April 12, 2010. It then retained two subparagraphs of paragraph 4, subparagraphs 4A and 4B. And it expressly stated that the duties in those subparagraphs were in regard to the bookkeeping ordered in the introductory sentences of the paragraph. Now it's true that the circuit court forgot to change paragraph 4B, language similar to that which he, in fact, changed in the introductory paragraph. But both the structure of paragraph 4 in its entirety, as well as the statement that the list set forth in the subparagraphs were in regard to the duties set forth in the earlier part of the paragraph, which had been narrowed, tell the reader that subparagraph 4B is, in fact, just a subpart of paragraph 4 and is limited by the court's altered language of that paragraph. We think that that's a clear reading under established principles of legal construction. But the more important thing is that it was at least a reasonable construction of the paragraph at that time. And Steve's reading of it in that fashion cannot be said to be confirmation. Yet it was the failure to list under paragraph 4B cases which Steve had taken in his individual capacity that the court found to be a basis for the contempt here. Quite respectfully, the trial court cannot admit the vagueness of its order, as it did in the portion of the transcript quoted in page 19 of our brief, and then find it parting in contempt for failing to correctly anticipate, and I'm quoting the circuit court here, how, quote, we will cover that ground when we get there. But even more objectionable is the court's use of paragraphs 8 and 9 of the June 23 order to sanction Steve for failing to turn over client files of his individual law practice. Those paragraphs proceeded pursuant to the uncontroversial premise, as stated in paragraph 8, that each of the parties have the right at any time to inspect the files of Hannigan and Bausman, close quote. In that context, paragraph 9 sought to clarify the parties' right to be informed regarding the resolution of any case either party shall have resolved since January 12, 2010. Nothing in paragraph 8 or paragraph 9 fairly imparted a duty to disclose client files of the new law firm. But that's the second act of contempt for which Steve is being punished here. Now, we believe that these interpretation problems were sufficient by themselves to prevent a finding of contempt. But additional concerns arise in light of the circuit court's finding Steve in contempt for failing to turn over client files. And chief among them is the attorney-client privilege. It's hornbook law that that privilege is the client's privilege. Only the client can waive it. Steve couldn't waive it. Mr. Sharp couldn't waive it. Mr. Harvey and Mr. Sharp together couldn't waive it. The clients at issue had retained Steve Hannigan, not Hannigan and Bausman, not Michael Hannigan, and certainly not Mr. Harvey. Under the rules of professional conduct, Steve was under an ethical restraint not to divulge to those outsiders the client's confidences. Yet by interpreting the June 23rd order retroactively to cover these clients' files and to have given Mr. Harvey and Michael the right of access to the same, the circuit court seemed to think that relevancy trumped privilege. But in fact, the law is exactly the opposite. Now, the Decker case discussed in our brief makes clear that the circuit court error. As stated in that case, and I quote, before an attorney can be compelled to disclose client information, the party opposing the attorney-client privilege must first establish that the information is not privilege. That's Illinois 153, Illinois 2nd at 321. That's to say mere relevance is not enough. Let alone that relevance admitted to be an open question when the order is entered, relevance determined only later when the contempt finding is entered. But that's what the circuit court did. Now, we developed both of these arguments more fully in our brief, and in response, the plaintiff in a 10-page brief filed after seven months of preparation and in response, the plaintiff essentially argues the invited error doctrine. Because Steve candidly admitted he had not listed in response to paragraph 4 cases taken in his own name, and because Steve candidly admitted that he hadn't turned over to persons outside his firm his new client file, Michael both here and below attempted to morph those admissions into an admission that the contempt finding was proper. It's as if Michael had never heard of the concept of friendly contempt. As in the friendly contempt context, when the circuit court indicated he was going to interpret the order contrary to Steve's treaty, Steve candidly admitted he had not complied with the order as so interpreted. What he never admitted was that he was supposed to make the disclosures in the first place, or that the court's interpretation of paragraphs 4 and 9 to reach the client of his new firm was proper. He never admitted that his new clients had an attorney-client relation with Hannigan Endowment, and he never waived their attorney-client privilege. The hope was that the court would impose nominal penalties so that the propriety of its reading of the underlying order could be quickly tested. But the court would not rule quickly, and when it ruled, its award was anything but nominal. Now, if you agree with me that the June 23rd order was insufficiently clear to engender the kind of consummationist intent that is necessary for contempt, if you agree with me that a party can't be found in contempt for failing to anticipate how the court may come down on issues that the court admits was left open, then you must reverse the orders of the circuit court below. Because the issue isn't whether Steve's conduct was in conformance with an order later entered. It is whether he knew at the time that his conduct was in violation of an order that had been previously entered. Similarly, if you find, as I think you must, that the court never found the subject files were nonprivileged, the orders of the circuit court cannot stand. But if by chance you disagree with me on those points, you still must reverse the sanctions entered here. Because a monetary sanction of attorney's fees must be for fees relating to the points where the party was found to be in contempt. And Mr. Harvey's application covered everything remotely relating to his rule-of-show-cause motion and all subsequent proceedings. The motion for a rule-of-show-cause had four counts. It sought to name Michael as the sole lining-up partner. It sought an accounting. It sought other relief. Three of the four counts were eventually dismissed. Yet Mr. Harvey sought compensation for all the work on all four counts. Moreover, the order at issue had 12 paragraphs with eight additional subparts. Steve was found to have violated only one subpart and part of another paragraph. But Mr. Harvey's fee application was not limited to the violations found. He indiscriminately threw in everything but the kitchen sink. It was apparent in the circuit court ultimately found that the bulk of the requested sum was unreasonable. But it was not apparent, and the circuit court could not find, that any particular sum was proper. The burden of establishing the right to fees is upon the party seeking them. Michael authorized the kitchen sink approach. Michael must bear the consequences. How does a judge come up with $11,178? Where'd that come from? The record is completely silent on that point. He sat on the case for months, and he entered the order that you have in front of you, and that's the full extent. But I submit to you that if you look at Mr. Harvey's application, as well as the responses that we filed to it, there's no way that any particular amount, let alone that particular amount, can be found to be correct. And the burden is on the plaintiff to show an amount. The court pulled the figure from the air, I believe. Michael failed to submit evidence from which anyone could determine the amount that had been damaged by the two violations it issued. And the court cannot hear that situation for him. Thank you. If there are any questions, I'd be happy to entertain them. Thank you, Mr. Connolly. Thank you. May it please the court, counsel. I am keenly aware of the old adage about a lawyer who represents himself in court. And I suppose it's as true now as it ever has been. But here I am. Let me start first by commenting on some of the facts the opposing counsel brought up. Hannigan and Dousman operated out of 901 North Street for over 40 years. Its reputation was good. It had a constant stream of clients. When the defendant gave notice of his intent to dissolve the partnership, he also indicated an intention to move out within a couple or a few weeks. He did not do that. He stayed at 901 North Street for about 15 months. During that time period, although the plaintiff was aware that he was talking to new clients, it took some time before the plaintiff became aware of the extent of the difficulty here. It turns out that while he was taking on new clients, Hannigan and Dousman, the firm of Hannigan and Dousman, the utilities of 901 North Street, the electric bill, the water bill, the salaries of all the employees, even employees that were working partly for cases that Steve, the defendant, now maintained were his own cases. So without getting into additional detail on that, I think the court needs to be aware of the fact that as these facts became more aware, the notion of constructive trust being applicable became more aware to the plaintiff as well. Now, in the judicial admissions, in the defendant's reply brief, the defendant points out that judicial admissions, the principle of judicial admission is an evidentiary rule of law. That rule provides that a party may not admit fact and then later seek to contest the fact. That is what we are saying has happened here. Whether a party is in contempt of court or not is a question of fact. It's not a question of law. I do not see this, the particular finding of contempt with the fees awarded, as being anything more than an attempt to recoup some of the substantial expenses that the plaintiff has had in this case. Mr. Hannigan, did you give a TRO against your brother? Yes. But that was done very shortly after the announcement of dissolution, wasn't it? That's correct. And in the TRO, did you ask about all of this use of funds to pay employees and things of that nature? The TRO was later in January of 2009. The dissolution was January 12th. So I wasn't aware that this was going to be a problem at the time. What I was concerned about was the possible conversion of client funds from Hannigan Adoption Cases, which, in fact, the record shows did take place. In fact, took place the day after he gave me notice of the dissolution. But your TRO was eight days after the notice? Well, I believe that's about right. January 20th? So what did you ask for in the TRO? Well, that he be constrained from converting client assets and other things of that nature. I can't describe to you in detail. But basically it required that he not move assets, property, or anything else of that sort. So I'm trying to get a handle on when you said he stayed 15 months and you didn't know all of this was going on. You obviously filed a TRO and got some relief, and I guess your brother moved out 15 months later? Judge, it's not a matter of knowing like a light switch. I know it or I don't know it. It's a matter of gradually becoming aware of these things. Was he violating the TRO? I don't know that he was. Well, in fact, he did. I know. I take that back. The day after he gave notice of dissolution, he converted a client's fee to himself. But the TRO hadn't been entered yet. After that, there were a couple other cases in which he took client fees, which may in fact have constituted conversion of Hannigan Adoption Funds. So when do you believe the constructive trust would have ended? Well, the court has ruled on that, and I don't have the date in front of me, but the court calculated based on some notion of the court's own judgment, and he may have entered an order as to what cases would be covered by the constructive trust. And you don't know the date of that? I don't, Your Honor. So in a way, I mean, as Mr. Hundley has indicated, though, that matter is not in front of the court at this time. Well, I guess what I'm trying to figure out is why you would have sought cases that were signed up after the dissolution. Well, as I understood Mr. Harvey's argument at the time, because my brother had continued to use the goodwill of the Hannigan Adoption Fund, continued to use its office location, and continued to use employees of that firm and paid by that firm, that the argument that my prior attorney made was that that means that the defendant had been usurping partnership opportunities that properly belonged to Hannigan Adoption Fund for himself, and using Hannigan Adoption Funds in some measure to pay for the prosecution of those cases, which were a list of which, by the way, was kept secret. He told the bookkeeper to keep that confidential from me. But you would agree that once he moves out clearly, those cases are not Hannigan endowment cases. Well, it depends on what you mean by those cases. Cases he signs up after he moves out. Cases he takes after he's moved. It could be that there's a residual of goodwill that's, for example, here's what can happen. A client calls the office, talks to the attorney, doesn't want to come in the right way to see if the attorney may come in a few months later. So I don't know that the actual move-out date would be the cutoff date, I would argue, for the end of constructive trust. And I don't know what that date actually is right now. But the point I would make is that for 15 months at least, the defendant used the goodwill of Hannigan Endowment to net new cases for himself that he claims were his exclusively, and yet Hannigan Endowment was the goodwill of the firm that brought those cases in, and he used some Hannigan Endowment funds to pay for the development of those cases. Okay, thank you. In any event, the opposing attorney in his discussion, in his reply brief, mentions two cases that involve judicial admissions, and the Sekosko case and the Mueller case. And I think those cases are distinguishable here in this respect. In Sekosko, there actually was a hearing, and there was an in-camera inspection of documents. And in Mueller, there was a hearing. Sekosko didn't involve anyone asking to be held in contempt or even suggesting it. In the Mueller case, the contempt were there, did not admit contempt, but after it was clear that the court was not going to rule in his favor, he suggested to the court that the court ought to perhaps enter a contempt order, which he would then appeal. But we don't have that here. In fact, in Mr. Hundley's reply brief, he says, unlike the present case, the court conducted a hearing in this case, just as we were getting ready to have the hearing on the petition for rule of show cause. That was when the defense all of a sudden wanted to reach an agreement, and that was when the defense decided they were going to admit the contempt, so that there's no evidence, really. There's not a hearing for this court to look at to determine whether there's privilege on these cases or not. All the court has is the assertion by the defendant that these are his cases and he shouldn't be giving out information as to these cases. So you would agree that an in-camera hearing would be a good idea? Generally, yes. I mean, that's what Sekosko did. And in many cases, if you've got a ñ I mean, you can't just allow a party, a plaintiff, defendant, or whatever, to say these are privileged and a story. But if the judge ñ the judge could have avoided a contempt finding here if there would have been a hearing and an in-camera inspection, right? Possibly, but the judge didn't make a contempt finding. It was an admission by the defendant. An admission that he didn't comply with the court order. No, an admission of contempt. I have got the two occasions on which it's discussed here. On November 1, 2010, this is at Supplemental 4. We just filed last week a supplement to the Record on Appeals. It's about eight pages long. And on that date, Mr. Scharf, the previous defense attorney, says to the judge, I'd like to announce a partial resolution of the matters before the court. In fact, I'd say a complete resolution if you will. He goes on a little bit and he says, the defendant, Steve Hamian, will admit to being in contempt of court for failure to provide the list as provided in paragraph 4B of a certain order. Nothing else in the rule of show cause will be admitted, which makes me wonder why opposing counsel is talking about paragraphs 8 and 9 when it's only 4B that he's admitting to contempt in. But that's the clear admission right there. It says later here at page S6, Steve Hamian should have the right to purge himself of this agreed contempt by delivering to opposing counsel within 20 days' date a list in compliance with paragraph 4B. So, on that particular occasion, the defendant is saying they're admitting to contempt and here's the guideline for how they're going to purge themselves of it. Then the documentary order, which the court makes at that point, actually the court makes it November 1st, says, Petitioner to Mr. Harvey, Respondent to Mr. Sharp, hearing begins, but before court rules, the parties reach an agreement. So again, this highlights the fact that we could have had a hearing on this, the defendant could have raised these legitimate arguments about whether something is privileged or not, but the court was deprived of that opportunity because the defendant decided to admit the contempt. The court didn't rule on the contempt. The defendant admitted the contempt. And then in the defendant's initial brief, the defendant mentions that on April 30, 2010, the parties reached an agreement that the bookkeeping for Hannigan and Dowson would be done by an outside bookkeeper. And this, I think, warrants a little bit of attention because it shows some of what was going on about what's going to be included and what's not going to be included. On April 30th, this is Volume 8 in the Record on Appeal, on April 30th, 2010, there was a motions hearing. And at page 1455 in the Record, there's Mr. Harvey and Mr. Sharp apparently have reached an agreement again, and Mr. Harvey recites this at page 1455. The bookkeeping for the Hannigan and Dowson firm will be done by Ellen Bernard, who is an employee of Craven & Associates. Ms. Bernard will be provided with two separate lists. The first will be a list from both of the parties for any case that originated prior to January 12, 2009. The second will be for any case that originated between January 12, 2009 and April 12, 2010, which is the approximate date that the defendant moved out of the 901 North Street location. Let me ask you the same question Justice Spomer asked. Where did the 11,178.75 come from? Well, if you look at the petition or the fee petition or whatever you want to call it that my prior attorney filed, you will see it is not bashful. I don't know if the judge went line by line and said, yes, this should be included, yes, this should be, but not this. He won $32,000 first, right? I'm sorry? He won $32,000 first? Something like that was what Mr. Harvey suggested, yes. Just for the contempt? Well, in the expenses for investigating whether or not there had been contempt committed, and there's all sorts of stuff listed there. Everything for the contempt only? That's what he was saying, yes. And you agree with that? I paid him. You paid him $32,000? But I don't necessarily agree that $32,000 is the correct number. Again, as I say, it's not bashful. And somehow the trial judge said you were talking about $11,000. Well, the trial judge apparently looked at what Mr. Harvey had prepared and had determined that he, the trial judge, thought that $11,000 in the $11,000 figure was a more reasonable number, or the appropriate number, or whatever you want to call it. But we do not have any kind of detail. Did he give you the $20,000 back to you? Did what? Did the attorney give you $20,000 back to you? No. But in any event, at this hearing there was this statement, and this kind of shows some of the confusion that is being created because time to time the plaintiff and the defendant think we have an agreement. It turns out we don't. But on page 1456, this is again the hearing I mentioned before, Mr. Harvey is stating, as we indicated, Judge, any case taken in by Stephen Hannigan under the name of Hannigan and McGovern after April 12, 2010 will not be included in this accounting. Now keep in mind, after April 12, 2010, the implication is that any cases before April 12, 2010 will be reported. And there's no argument from the defendant at this point saying, wait a minute, wait a minute, we're not going to go up to April 12, 2010. We shouldn't have to give you anything going up to April 12, 2010. We should only give it to you as of January 12. Now there's a clarification in the record by the individual defendant at page 1457 where he says, Mr. Steve Hannigan says, you were requesting a list of all cases before January 12, 2009. Yes. And cases January 10, 2009 through April 12, 2010. Yes. Yeah, I believe so. I think the date 2009 is January 12, though, isn't it? Mr. Harvey says it is January 12, 2009. And Mr. Sharp says it could be done, Your Honor. So at this point in court, as far as what the defendant is representing, is that the defendant is agreeable to give information about cases going up to April 12, 2010. And it turns out that doesn't work out either. So in short, it's my opinion and my argument that what happened here was different than what happens in the so-called friendly contempt cases where the court does make a finding after a hearing, maybe after an in-camera inspection. Here, because the defendant admitted the contempt and all the stuff that would be included in it, if a defendant, for example, in a negligence case admits liability, guess what? He's admitting the negligence allegation. I'm confused. When you say he's admitting contempt, he's admitting the fact that he's refusing to turn these over because they're privileged. But when his argument there, and I believe here, is that isn't it your burden to show that it was non-privileged information and then look at the court? We were getting ready to do that with a hearing when the defendant decided to admit the contempt. So you're saying that that was cut short? Yes. You were going to proceed with an in-camera or that? No, not necessarily in-camera, but Mr. Harvey was prepared to go forward with this hearing on the petition for rule of show cause and it got derailed when the defendant said, well, we'll admit, we'll admit contempt. Okay. And so the problem here is that unlike other cases- That he cites Decker, where it's your burden to go forward with proof that it's not confidential. Yes. But here's the thing about that. At this point in time, it may well be that the defendant had a legitimate argument on privilege. Keep in mind, the constructive trust order wasn't entered until much later, and, in fact, wasn't even pledged until later. But at this point, it may be that these items were privileged, but it doesn't matter for purposes of contempt as far as I'm concerned, because this, as I say, is a way to try and recoup some expenses for the prosecution of the case when it seems clear that the defendant is obstructing and is not doing what he's agreed he would do or it was ordered to do. So for that reason, I think some award of attorney's fees is correct. Now, in terms of how it was calculated, I don't know, and we don't know that from the court. So in summary, I would say that what I would ask is that this court affirm the trial court's order of November 15th of 2010 and that with respect to the trial court's documentary order of February 9, 2012, the one that actually awarded the attorney's fees, I would ask that the court affirm it or, in the alternative, remand it back to the trial court for a reconsideration of the issue of the attorney's fees and a more articulate, I suppose, explanation as to the basis for calculating what are reasonable attorney's fees or not. Thank you, Mr. Hannigan. Do we have the opportunity for rebuttal, Mr. Humphrey? I'll be brief. In his opening remarks, Mr. Hannigan made much of the fact that my client stayed on the premises for 15 months. But this is a building that my client owned half of. It wasn't owned by Hart Hannigan and Dousman. It was owned by Steve and Michael in their personal capacities. Furthermore, he was under the standstill order. He thought obligated to stay there for a while. In any event, the moving out point, while the plaintiff ultimately admitted that that was the end line, is not the talisman to touch on for whether or not Steve had a right to start his own practice. To the contrary, the law is that when you dissolve the partnership, you're entitled to start your own practice. Mr. Humphrey, I'm sorry to interrupt, but I want to follow up on something Justice Chapman was getting to. You want this contempt finding or order reversed, correct? Yes, I do. How do we do that when your client admitted to it or agreed to it? The client admitted that he had not produced the list under paragraph 4B. So in your mind, there's a difference between the question I'd asked. Acts which were found to be constituting the contempt and admitting that he was in contempt. We never admitted that we understood that we were committing a contemptuous act. We never admitted that. I think a point that Mr. Hannigan made in attempting to criticize my presentation is significant. He says, I don't know what he's going into paragraph 8 and 9 about. Well, I'm going into paragraph 8 and 9 because it's only through paragraphs 8 and 9 that the duty to produce client files occurs. And Steve was punished for not producing client files. And the court found my client to be in violation of paragraph 9. He is quite correct in the transcript. The only admission is with respect to paragraph 4B. But the finding of the court, because it ultimately is entered, is with respect to both 4B and 9. And the files issue only comes up in paragraph 9. I think that that's an admission, in essence, that the order can't stand. He is correct that the constructive trust complaint was not filed. He was unsure about the date when the order was entered. The finding of the court here was below, after the events at issue, were that the constructive trust would apply to cases taken in the first eight months after the dissolution of the partnership. He quoted the transcript about the lists that were to be provided. But I urge you to carefully read that because those were to be lists of Hannigan endowment cases. Nowhere in that transcript of April 30th was there a statement that we were agreeing to produce Stephen F. Hannigan attorney at law cases or Hannigan and McGovern cases. It was the Hannigan and McGovern that was to be the list that was to be produced. I've previously explained what my client's understanding of that was, and it's insufficient to support a contempt finding against my client. Thank you.